983 F.2d 1078
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald Craig KESSACK, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert M. PETTY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin L. DEWITT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Pasqual DEBRAINE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jordan Rodrigues QUINTAL, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gary GRANGER, Defendant-Appellant.
 Nos. 90-30240 and 90-30291 to 90-30295.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 7, 1992.
Decided Jan. 7, 1993.
As Amended May 3, 1993.
 
 Before: HUG, NOONAN and DAVID R. THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 FACTS
 
 2
 Donald Craig Kessack, Robert M. Petty, Melvin Lee Dewitt, Pasqual Debraine, Jordan Rodriquez-Quintal, Jr. and Gary Granger were all convicted of conspiracy to distribute cocaine in the State of Washington between 1984 and 1989. Kessack was the kingpin. He once bragged of selling 10 kilograms of cocaine a week for six straight months. The DEA began investigating Kessack in 1985. The investigation was sporadic until 1987, when it became a DEA task force case. Confidential informants, toll records, controlled purchases and surveillance established that Kessack was distributing large amounts of cocaine in the Seattle area and laundering the profits through a floor covering business. But the identity of Kessack's confederates and the scope of their conspiracy remained a mystery. In July, 1989 the DEA obtained a warrant to wiretap the telephones and telephonic pagers of Kessack and Neil Ellis Stokes, a retailer for Kessack who eventually pled guilty and testified for the government. The wiretaps uncovered massive evidence of the defendants' cocaine trafficking. This evidence and its fruits were the prosecution's chief weapons in convicting most of the defendants.
 
 
 3
 The defendants were named in a 90-count superseding indictment on September 28, 1989 and convicted after a month-long jury trial. In this consolidated appeal, the defendants together challenge the legality of the wiretaps. The defendants also make individual challenges to their convictions and sentences.
 
 
 4
 The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 1291. We affirm all of Kessack's convictions and his sentence. We affirm the convictions of Petty, DeWitt, DeBraine and Quintal, except we reverse their convictions on Count 83. We vacate the sentences of DeWitt and DeBraine and remand for resentencing. The sentences of Petty and Quintal are vacated by a separate opinion filed herewith and their cases are remanded for resentencing. We reverse nine of Granger's fourteen convictions and remand for resentencing.
 
 ANALYSIS
 
 5
 A. The Wiretaps.
 
 
 6
 Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, permits electronic surveillance of individuals by law enforcement officials, when authorized by a federal district court. The Act imposes a number of procedural requirements that must be satisfied before the warrant may issue.
 
 
 7
 (1) Necessity.
 
 
 8
 An application for a court-authorized wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), and facts indicating that "normal investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c). The district court's decision that a wiretap was necessary is reviewed for an abuse of discretion. United States v. Brown, 761 F.2d 1272, 1275-76 (9th Cir.1985).
 
 
 9
 DEA Agent Gregory M. Gassett provided a 57-page affidavit to support the government's application for a wiretap on Kessack's home telephone and telephonic pager. The Gassett affidavit adequately alleges "specific circumstances that render normal investigative techniques particularly ineffective." United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir.1985). The affidavit detailed the peculiarities of the Kessack drug ring and the difficulties the government had had in investigating the conspiracy. The Gassett affidavit described the government's three-and-a-half year effort to uncover the scope of the drug ring, its members, its way of operating and its principal suppliers. Before turning to wiretaps, the government used several confidential informants, undercover agents, personal and video surveillance, garbage searches, reviews of phone records and pen registers.
 
 
 10
 These many and varied methods has some marginal successes; but the ring was never cracked, broken or infiltrated. For the most part, the government was able only to engage the lower levels of Kessack's chain of distribution. Government agents could buy from the small-time sellers. But the inner circul of the drug ring remained tightly closed. Whenever the government turned a minor distributor into an informant, he was either threatened or banished from the drug ring. However, on one occasion an undercover agent, Mary McElderry, was able to buy a kilogram of cocaine from Kessack himself. Kessack later sought her company and appeared willing to sell her more drugs. The defendants suggest that this opening should have been explored more fully by the government.
 
 
 11
 After a presentation of witnesses, a review of all the evidence and extensive oral arguments, the district court made a factual finding that, as the Gassett affidavit asserted, Kessack had indicated to McElderry that he alone would be dealing with her. IV Transcript of Motions To Suppress ("T.M.") 620. This factual finding is not clearly erroneous. See United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir.1988) (factual findings about misleading statements and omissions in wiretap application reviewed for clear error). Direct purchases from Kessack by McElderry would not have achieved all of the government's objectives. The wiretaps were still necessary. "We have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators." United States v. Torres, 908 F.2d 1417, 1422 (9th Cir.1990). This holds true even when an undercover agent such as McElderry has gained the trust of the conspirators. Id. at 1422 n. 2.
 
 
 12
 The government's few and modest successes with confidential informants and undercover agents strongly suggested that undercover work alone was not the complete solution to the crimes being committed or to the identification of the perpetrators. See United States v. Scully, 546 F.2d 255, 260 (9th Cir.1976), cert. den., 430 U.S. 970 (1979). A repeat of past efforts would likely have failed. To crack the ring, the government had to do more and different things than it had already done. "As a general rule, the wiretap should not be the initial step in the investigation, but law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." United States v. Brone, 792 F.2d 1504, 1506 (9th Cir.1986) (citations omitted). Although it did not examine every stone in the garden, the government left few unturned. That suffices.
 
 
 13
 Under the abuse of discretion standard, a reviewing court cannot reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors. Abatti v. Commissioner, 859 F.2d 115, 117 (9th Cir.1988). The appellate court cannot simply substitute its judgment for that of the lower court. United States v. BNS, Inc., 858 F.2d 456, 464 (9th Cir.1988). The district court did not abuse its discretion in finding that the wiretaps were necessary.
 
 
 14
 (2) Minimization.
 
 
 15
 The government must conduct wire intercepts with an effort to "minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). The government has the burden of showing minimization. United States v. Torres, 908 F.2d 1417, 1423 (9th Cir.1990). Whether the DEA properly minimized the monitoring of phone conversations irrelevant to its investigation is reviewed de novo. Id.
 
 
 16
 The touchstone of minimization is "reasonableness". United States v. Abascal, 564 F.2d 821, 827 (9th Cir.1977). What is reasonable in one case is not necessarily reasonable in another. The government intercepted a high percentage of Kessack's phone calls. But Kessack was the kingpin and he spoke about his drug dealing in code. "Where the intercepted phone line is located in the residence of the head of the drug distribution conspiracy, monitoring agents may intercept a broader range of calls." Torres, 908 F.2d at 1424. Where conversations are "ambiguous in nature" or involve "guarded or coded language", the interception of a higher percentage of phone calls is reasonable. Scott v. United States, 436 U.S. 128, 140 (1978). The government adopted reasonable procedures and made reasonable efforts to comply with the minimization requirements.
 
 
 17
 (3) Identifying The Targets of the Wiretaps.
 
 
 18
 In its application for a wiretap, the government is required to include "the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv). It is not enough for the government to name only the principal targets of the investigation. The application must name all those individuals for whom the government "has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." United States v. Donovan, 429 U.S. 413, 428 (1977). However, the government's "failure to comply fully with [section 2518(1)(b)(iv) ] does not invalidate an order authorizing a wiretap" and does not require suppression of its fruits. United States v. Martin, 599 F.2d 880, 886 (9th Cir.1979) (citing Donovan, 429 U.S. at 432-39).
 
 
 19
 The Gassett affidavit names only the principal targets of the investigation, Kessack and his coconspirator Neil Stokes. Petty and Debraine argue that they should have been named and that this omission requires that the evidence produced by the wiretaps be suppressed. Petty and Debraine argue that Donovan provides for suppression when government agents intentionally withhold the names of targets from its application. See Donovan, 429 U.S. at 436 n. 23. But the district court specifically found that there were no intentional misrepresentations in the government's application. This factual finding is not clearly erroneous. See United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir.1988) (factual findings about misleading statements and omissions in wiretap application reviewed for clear error). Accordingly, even if there were probable cause to suspect Petty and Debraine of trafficking drugs, the wiretap order was not invalid and its fruits need not be suppressed.
 
 
 20
 (4) The Extension of the Wiretap.
 
 
 21
 An affidavit in support of an extension of an existing wiretap must set forth "the results thus far obtained from the interception, or a reasonable explanation for the failure to obtain such results." 18 U.S.C. § 2518(1)(f). No defendant disputes that Gassett's application for an extension satisfied this requirement.
 
 
 22
 An application for an extension also must satisfy the same requirements as an original order. 18 U.S.C. § 2518(5). See United States v. Giordano, 416 U.S. 505, 530 (1974). Debraine argues that the government failed to prove the necessity of the extension. The district court found that the application for an extension met all the requirements of section 2518. IV T.M. 622. The district court's decision that a wiretap was necessary is reviewed for an abuse of discretion. United States v. Brown, 761 F.2d 1272, 1275-76 (9th Cir.1985). Not all of the stated purposes of the wiretap order had been achieved, even if a number of those purposes had been. The district court's finding was not an abuse of discretion. United States v. Bailey, 607 F.2d 237, 242 (9th Cir.1989).
 
 
 23
 Debraine argues that where the government uses an extension to wiretap the telephones of conspirators other than those mentioned in the original application, it must separately prove the necessity of so doing. See United States v. Brone, 792 F.2d 1504, 1507 (9th Cir.1986); United States v. Santora, 600 F.2d 1317, 1321-22 (9th Cir.1979), amended, 609 F.2d 433 (9th Cir.1979). This is true but irrelevant. The extension was limited to the same telephones and principal targets as the original order.
 
 B. DeWitt
 
 24
 DeWitt argues that the search of his home lacked probable cause. In reviewing the issuance of a search warrant, the court must determine whether the magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. United States v. Rodriguez, 869 F.2d 479, 484 (9th Cir.1989). See Illinois v. Gates, 462 U.S. 213 (1983). This standard of review is "less probing than de novo review and shows deference to the issuing magistrate's determination." United States v. Angulo-Lopez, 791 F.2d 1394, 1396 (9th Cir.1986). A magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept and he may rely on the conclusions of experienced law enforcement officers in so doing. United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir.1987).
 
 
 25
 The government offered a forty-page affidavit of DEA Agent Gassett to support its application for warrants to search various locations, including DeWitt's home. A magistrate issued the warrants on September 5, 1989 and DeWitt's house was searched five days later. Amongst other things, the search uncovered firearms, large amounts of cash and other valuables, 84.5 grams of cocaine, and a triple-beam scale.
 
 
 26
 Only a few paragraphs of the Gassett affidavit refer to DeWitt. The affidavit reports two recorded phone conversations between Kessack and Anita DeWitt, Melvin DeWitt's wife. The affidavit also says that DeWitt had been previously arrested for a violation of the Uniform Controlled Substance Act. As the government readily admits, this last statement is untrue. A Melvin Curtis DeWitt had been so arrested, but not defendant Melvin Lee DeWitt.
 
 
 27
 In both of the recorded phone conversations, Kessack telephoned the DeWitt residence and spoke with Mrs. DeWitt. He asked after something and Mrs. DeWitt clearly wished to speak about that thing in the most vague language possible. She told Kessack that her husband, although not at home, had in fact left "a little something" for Kessack to pick up. There was no direct evidence as to what that "something" was. The conversation was cryptic. However, at the time of Kessack's first conversation with Mrs. DeWitt, he was busily engaged in rounding up money owed to him by his distributors so that he could make a large cocaine purchase. In other contexts, this sort of conversation might appear entirely innocent. But in determining probable cause, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty' but the degree of suspicion that attaches to particular types of noncriminal acts." Gates, 462 U.S. at 243-44 n. 13. Kessack's well-established drug dealing, DeWitt's apparent involvement with drugs and the language and context of these conversations all support the conclusion that DeWitt was involved with Kessack in distributing drugs.
 
 
 28
 Gassett concluded that, in his phone conversations with Mrs. DeWitt, Kessack meant to pick up drug money owed to him by her husband. The magistrate was entitled to rely on Gassett's conclusion. In light of all the evidence produced in the affidavit, it was a reasonable inference that evidence of drug activity would be found at the DeWitt residence. "In the case of drug dealers, evidence is likely to be found where the dealers live. When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistant's residence as well as the ringleader's." United States v. Angulo-Lopez, 791 F.2d at 1399 (citations omitted). The magistrate had a substantial basis for finding probable cause and issuing the warrant to search DeWitt's residence.
 
 
 29
 DeWitt next argues that the evidence produced by the search should have been excluded from trial under Frank v. Delaware, 438 U.S. 154 (1978). Under Franks, a false, material statement, made intentionally or recklessly, cannot be used to establish probable cause. The reviewing court must set aside such a statement and determine whether what remains of the affidavit is enough by itself to establish probable cause. United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir.1985).
 
 
 30
 The government openly admits that the statement that DeWitt had been previously arrested on a drug charge was untrue. The district court found the statement material. The court also found that the statement was not made knowingly and intentionally or with reckless disregard of the truth. Whether a false statement is made intentionally or recklessly is a factual finding reviewed for clear error. United States v. Dozier, 844 F.2d 701, 705 (9th Cir.), cert. den., 488 U.S. 927 (1988).
 
 
 31
 As the district court noted, this issue turns squarely on whether the government included the offending statement in its affidavit either intentionally or recklessly. "Innocent misrepresentations by the affiant, even if material, [do] not vitiate a search warrant." United States v. Young Buffalo, 591 F.2d 506, 510 (9th Cir.1979). After an evidentiary hearing, at which the author of the affidavit both testified and was cross-examined, the district court found the statement to be an innocent mistake. No evidence at the hearing undermines this conclusion. The district court made no clear error. The false statement need not have been redacted from the affidavit.
 
 
 32
 DeWitt raises three sentencing issues. First, he argues that the district court erred in refusing to reduce his base offense level under section 3E1.1 for his acceptance of responsibility. We review the court's finding for clear error. United States v. Aichele, 941 F.2d 761, 767 (9th Cir.1991). The Commentary to the Guidelines makes clear that the sentencing judge is "in a unique position to evaluate a defendant's acceptance of responsibility" and that evaluation is entitled to "great deference." § 3E1.1, comment. (n. 5).
 
 
 33
 In his conversation with the probation officer preparing his presentence report, DeWitt insisted that his only involvement with Petty and Kessack was sport fishing. DeWitt clearly was denying a criminal association with the major players in the conspiracy for which he was convicted. In that same conversation with the probation officer, DeWitt did accept responsibility for what he had done with his own hands, but he refused to accept responsibility for what his coconspirators did in furtherance of the conspiracy. DeWitt's conviction, however, was for conspiracy, and that crime he never embraced. Certainly, DeWitt was not required to accept responsibility for "unproved, uncharged conduct." United States v. Piper, 918 F.2d 839, 840 (9th Cir.1990). But a protest of innocence for the central crime of one's conviction is not an acceptance of responsibility. United States v. Skillman, 922 F.2d 1370, 1378-79 (9th Cir.1990), cert. dismissed, 112 S.Ct. 353 (1991).
 
 
 34
 Second, DeWitt argues that the district court erred in denying him a downward departure as a minor participant in the conspiracy, under section 3B1.2(b). This reduction is meant for those who are "substantially less culpable than the average participant" in the offense. Id., comment. (backg'd). A district court's finding that a defendant does not merit this reduction is reviewed for clear error. United States v. Flores-Payon, 942 F.2d 556, 560 (9th Cir.1991). The evidence, including Kessack's proffer, shows that DeWitt bought many kilograms of cocaine from Petty and Kessack, and that he did so over a number of years. He sold and bartered the drugs, and appears to have lived largely off the profits. A middleman in a drug conspiracy, like DeWitt, is not a minor participant. See Flores-Payon, 942 F.2d at 561 (one who participates in drug transaction is not minor participant); United States v. Sanchez-Lopez, 879 F.2d 541, 557 (9th Cir.1989) (one who drives a car containing a "significant quantity" of drugs, e.g., 574.06 grams of heroin, is not a minor participant).
 
 
 35
 Third, DeWitt contests a two-level enhancement of his base offense level for possession of a firearm during commission of the drug offense. See § 2D1.1(b)(1). The district court's factual finding that DeWitt possessed a firearm is reviewed for clear error. United States v. Burns, 894 F.2d 334, 336 (9th Cir.1990). The enhancement should not be applied if it is "clearly improbable that the weapon was connected to the offense." Id., comment. (n. 3). An unloaded .25 caliber pistol was found in a locked safe in DeWitt's basement. Evidence at trial established that DeWitt sold cocaine from his home. Cocaine and a triple beam scale were found in the master bedroom of his home. The record reflects that DeWitt "stipulate[d] and agree[d]" in a forfeiture action that the pistol "was used or intended to be used to facilitate the commission of a conspiracy to distribute cocaine." DeWitt cannot now contest the truth of his own admission. The enhancement was proper.
 
 
 36
 C. Debraine.
 
 
 37
 Debraine argues that the testimony of George Gayos was inadmissible evidence under Fed.R.Evid. 404(b). But the district court admitted Gayos' testimony as substantive evidence of Debraine's involvement in the conspiracy. II T.M. 232-33. Evidence that goes "directly to the substance of the charges" is not evidence of other bad acts; such evidence is "relevant to prove the elements of the crime and ha[s] no prejudicial effect other than to incriminate" the defendant. United States v. Pacheco, 912 F.2d 297, 303 (9th Cir.1990). Gayos' testimony did indeed go directly to the substance of the charges against Debraine. Gayos testified that Debraine sold him three kilograms of cocaine and that Petty delivered the drugs to him. If believed, this was proof of the conspiracy at work. The district court did not abuse its discretion in admitting Gayos' testimony. Id.
 
 
 38
 Debraine makes the same argument to exclude evidence of his possession of $60,000 in a dangerous, drug-ridden part of Los Angeles in May of 1989. Debraine was stopped by the Los Angeles police, who discovered the cash in the trunk of Debraine's rented car. Debraine was taken briefly into custody and the cash was confiscated. Contrary to Debraine's assertion, that evidence was admitted as substantive evidence of his involvement in the Kessack drug ring, and not under Fed.R.Evid. 404(b). VII T.M. 1460. A recorded conversation between Kessack and Petty made clear that the money belonged to Kessack and was intended to be used to buy cocaine. The evidence helped to prove how the drug ring operated and Debraine's role within it. As with Gayos' testimony and for the same reason, the district court did not abuse its discretion in admitting evidence of Debraine's possession of $60,000. Id.
 
 
 39
 Debraine raises one sentencing issue. He argues that the district court erred in denying him a two-level reduction for acceptance of responsibility. After trial but before sentencing, Debraine wrote a letter to the court, which was filed under seal at Debraine's request, laying out his role in the conspiracy and accepting responsibility for it. On its face, the letter appears contrite. The district court might not have believed in Debraine's sincerity, but the court never expressed its disbelief on the record. The court did not give much of an explanation for why the letter was insufficient, saying only that a defendant who "come[s] before the court in writing, as Mr. Debraine has done, and say[s] he's sorry for what he's done ... is not sufficient to satisfy" the Guidelines. But Debraine's sorrow, if credible, is precisely what the Guidelines are looking for.
 
 
 40
 The district court might have thought that Debraine's acceptance of responsibility had come too late. But it is settled law that a district court may not deny the reduction because of a defendant's constitutionally-protected choice to proceed to trial "in spite of other manifestations of sincere contrition" that come only after conviction. United States v. Sitton, 968 F.2d 947, 962 (9th Cir.), cert. denied sub nom, Romero v. United States, No. 92-6112 (S.Ct. Nov. 9, 1992). This rule is of especial importance in cases like Debraine's. He had initially sought a plea bargain, but the prosecutors would only accept a package deal and other defendants were unwilling to comply. Debraine was more or less forced to trial. Any admission of responsibility before trial would have been used against him at trial. Where, as a practical matter, a defendant is blocked from arranging his own plea agreement, because the government insists on a package of pleas, and the defendant has in fact "accepted responsibility by statements made after the conviction [he] is entitled to this reduction." United States v. Johnson, 956 F.2d 894, 905 (9th Cir.1992). Because the district court's evaluation of a defendant's acceptance of responsibility is due "great deference," § 3E1.1, comment. (n. 5), and the sincerity of Debraine's words is hidden in the cold pages of a transcript, we remand Debraine's sentence to determine whether Debraine's acceptance of responsibility was a manifestation[ ] of sincere contrition." If, in light of all the relevant factors, the district court finds that it was, Debraine is entitled to the reduction. Johnson, 956 F.2d at 905; Sitton, 968 F.2d at 962.
 
 
 41
 D. Quintal.
 
 
 42
 (1) The 1989 Search of Quintal's House.
 
 
 43
 All of the defendants except Quintal were arrested on September 10, 1989. On September 14th, an arrest warrant for Quintal was issued by the DEA office in Washington State. On the next day, DEA Agent Bratton of the San Diego office, working in conjunction with Gassett, sought a search warrant for Quintal's house. In his 21-page affidavit supporting his application to search Quintal's house, Bratton narrated the basic history of the government's investigation of the Kessack drug ring.
 
 
 44
 Amidst the thousands of tape-recorded phone calls, Quintal's name was mentioned only once, during an anxious conversation between Petty and Kessack. Bratton's affidavit explained that conversation's context. Krohn, Petty's drug courier, had been arrested in Grants Pass, Oregon while bringing four kilograms of Kessack's cocaine up to Washington. The cocaine was confiscated. Krohn refused to act again as a courier. This left Petty and Kessack in a bind. Kessack wanted to keep the drug ring operating. He told Petty that he could round up "50"--meaning fifty thousand dollars--to buy more cocaine. He urged that the drug deals no longer take place in motels and that Petty "send Jordan up" with the drugs instead.
 
 
 45
 To corroborate that the "Jordan" mentioned by Kessack was Jordan Quintal, the affidavit explained that an address book seized in a search of Petty's house five days earlier contained a reference to Quintal's phone number. The government also checked the records of the local gas and electric company to verify that the utilities of the house subscribing to the phone number were in Quintal's name. Finally, the affidavit also recited that an arrest warrant had been issued for Quintal.
 
 
 46
 From Kessack and Petty's phone conversation, Bratton concluded that Quintal was a drug courier for the Kessack drug ring. He then declared, based on his experience as a narcotics officer, that those involved in distributing drugs typically maintain books, records, documents, paraphernalia and other evidence "in secure locations such as their residences". From this, Bratton concluded that he had particular reason to believe that such evidence would be found at Quintal's house. The magistrate read the whole affidavit and issued the warrant. In the event, the search uncovered telephone records linking Quintal to Petty, a small scale, a large triple beam Ohaus scale, six Derringer pistols and various documents. The district court denied Quintal's motion to suppress the evidence, finding probable cause for the warrant.
 
 
 47
 There is no neat formula for reviewing a magistrate's finding of probable cause. The command is to find a "substantial basis" supporting a "fair probability" that evidence will be found in a particular place. Gates, 462 U.S. at 238. Language of this kind is really only used at the end of one's reflections. It provides the smart and tidy legal words with which to wrap a common-sense judgment. The command is of little help in making that judgment in the first place. Quintal's case is a close call. The facile guidance of legal words leaves off.
 
 
 48
 It is fair to say that the affidavit establishes probable cause that Quintal was a drug courier for Petty. But a search warrant requires that the magistrate find probable cause establishing "that the things listed as the objects of the search are located in the place to be searched." United States v. Ramos, 923 F.2d 1346, 1351 (9th Cir.1991). The only real link between Quintal's home and the evidence sought was Quintal's work as a drug courier. Based on Bratton's considerable experience as a federal and state narcotics officer, we are asked to believe that those involved in drug dealing keep evidence "in secure locations such as their residences". The idea that drug couriers take their work home with them is not to be easily dismissed. However, it invites grave concern that probable cause to arrest one for being a drug courier ipso facto establishes probable cause to search one's home.
 
 
 49
 But these concerns need not be resolved here. Whether or not there was probable cause for the search of Quintal's home, the good faith exception of United States v. Leon certainly applies. 468 U.S. 897 (1984). In Leon, the Supreme Court held that evidence seized in violation of the Fourth Amendment "by officers reasonably relying on a warrant issued by a detached and neutral magistrate ... should be admissible in the prosecution's case in chief." Id. at 913. Whether the good faith exception applies is reviewed de novo. United States v. Dozier, 844 F.2d 701, 707 (9th Cir.1988). The test for an officer's good faith reliance on a warrant is an objective one, based solely on the facts as presented to the magistrate. United States v. Hove, 848 F.2d 137, 140 (9th Cir.1988).
 
 
 50
 Quintal argues that the good faith exception does not attach because the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975)). Quintal makes no other argument to defeat the good faith exception. "[T]he test for reasonable reliance is whether the affidavit was sufficient to 'create disagreement among thoughtful and competent judges as to the existence of probable cause.' " United States v. Hove, 848 F.2d 137, 139 (9th Cir.1988) (quoting Leon, 468 U.S. at 926). There is reasonable reliance on a warrant where its supporting affidavit makes a "colorable showing" of probable cause. Hove, 848 F.2d at 140. Two thoughtful and competent judges found probable cause for the warrant. The question remains vexing. There can be little doubt that the Bratton affidavit makes the required "colorable showing". The fruits of the search of Quintal's house were properly admitted into evidence.
 
 
 51
 (2) Other Issues.
 
 
 52
 Quintal challenges the legality of the 1987 search of his room behind the Precision Engine workshop. Quintal, a mechanic, was renting a room in a friend's car repair shop in Escondido, California. During an investigation of the so-called Mason-Perez drug ring, police were told by a confidential witness that Richard Perez had a hidden interest in the repair shop. The cooperating witness also provided detailed accounts of Perez's traffic in methamphetamine, including eyewitness accounts of large sales and personal purchases from Perez. Two other cooperating witnesses provided clear evidence of Perez's drug activity. Parts of their testimony was independently corroborated by police surveillance and interviews, which established Perez's regular presence at Precision Engine. A fourth cooperating witness established that Perez had a habit of concealing his ownership in classic cars. Given the totality of the circumstances, it is undeniable that the magistrate had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 238-39.
 
 
 53
 Quintal also argues that in executing the search warrant, the government exceeded the scope of the warrant. This question is reviewed de novo. United States v. McLaughlin, 851 F.2d 283, 285 (9th Cir.1988). When the police entered the repair shop, they came upon a locked room at the rear. The police were informed that the room was rented by Jordan Quintal, but no proof of the assertion could be supplied. The language of the warrant specifically authorized the search of Precision Engine, described as a "business encircled by a chain link fence ... with a sign fronting the property identifying the premises as Precision Engine." The "premises" include everything on it. See United States v. Bertrand, 926 F.2d 838, 841 (9th Cir.1991). Quintal's room was on the premises of Precision Engine, it reasonably appeared to be part of the same business, and could easily contain documents which were the object of the search. Closed rooms on the premises were within the purview of the warrant. The agents did not exceed the scope of the warrant.
 
 
 54
 The search of Quintal's room uncovered paraphernalia used in the wholesale distribution of cocaine and methamphetamine, including drug sifters, triple beam scales, an electric grinder (used to crush cocaine from "block" to "powder" form), cocaine cutting agents, chemicals used in the production of methamphetamine, laboratory equipment, a "Cocaine Consumer's Handbook", and suitcases used to carry cocaine. Also recovered were several loaded firearms, magazine clips, an ammunition belt, and rounds of ammunition scattered throughout the room. Numerous documents, including tax returns and bank receipts, firmly established dominion and control of the room by Quintal.
 
 
 55
 This evidence was introduced at Quintal's trial both as substantive evidence of the Kessack conspiracy and under Fed.R.Evid. 404(b). The admission of evidence at trial is reviewed for abuse of discretion. United States v. Brown, 880 F.2d 1012, 1014 (9th Cir.1989). It was a clear abuse of discretion for the district court to permit the evidence as substantive proof of the Kessack conspiracy. The Mason-Perez drug ring could not have been more distinct from the Kessack conspiracy: the two conspiracies were composed of entirely different members and involved the distribution of entirely different drugs in entirely different parts of the country. The trick is really to see how one could ever think they were the same conspiracy. Evidence of drug activity unrelated to a particular conspiracy is inadmissible as evidence of a defendant's association with that conspiracy. United States v. Bosley, 615 F.2d 1274, 1277-78 (9th Cir.1980).
 
 
 56
 Quintal also argues that the evidence was not properly admitted under Rule 404(b). But even if we were to accept this argument, we would still have to find that the evidence's admission was more likely than not to have affected the jury's verdict. "Having concluded that it was error for the district court to admit evidence pursuant to Rule 404(b), we reverse only if the error was not harmless. Errors such as this one, which do not rise to constitutional dimension, are not harmless unless it is more probable than not that the erroneous admission of evidence did not affect the jury's verdict." United States v. Brown, 880 F.2d 1012, 1016 (9th Cir.1989) (citations omitted).
 
 
 57
 It is more probable than not that the offending evidence from the 1987 search of Quintal's room had no effect on the jury's verdict. Ed Krohn provided an eyewitness account of Quintal's involvement in the conspiracy. He elaborately detailed Quintal's role as a bagman and courier for a $60,000 cocaine deal between Petty and Kessack. Krohn was an unsavory man whose testimony, standing alone, might have been disbelieved. But his testimony was independently supported by Kessack's taped reference to Quintal as a courier and the drug paraphernalia and documentary evidence found in Quintal's home. The evidence clearly establishes that Quintal was only a bit player in the Kessack drug ring. But it just as clearly establishes that he was a player. With or without the evidence from the 1987 search, the jury's verdict would have been the same. For this it also follows that there was sufficient evidence to support Quintal's convictions.
 
 
 58
 Finally, Quintal challenges various jury instructions. Those instructions, based on the Ninth Circuit's Model Instructions, were proper.
 
 
 59
 (3) Sentencing Issues.
 
 
 60
 The trial judge enhanced Quintal's offense level under section 2D1.1(b)(1), for Quintal's possession of the weapons discovered during the 1987 search of his room behind the Precision Engine workshop. The Guidelines in effect at the time Quintal was sentenced require an enhancement where a firearm "was possessed during commission of the offense," § 2D1.1(b)(1), and it is not "clearly improbable that the weapon was connected with the offense." Id., comment. (n. 3).
 
 
 61
 We already have found that the evidence uncovered in the 1987 search had no connection to the only conspiracy for which Quintal stands convicted, the Kessack conspiracy. It follows, mutatis mutandis, that the weapons seized in the 1987 search were not connected with the Kessack conspiracy, and it was clear error for the district court to find otherwise. The error is magnified by the absence of any evidence that Quintal was even a part of the Kessack conspiracy before the 1987 search. It is a metaphysical certainty that weapons seized by the police from a defendant were not subsequently possessed by the defendant during his commission of a later offense.
 
 
 62
 Quintal next argues that the district court erred in refusing to reduce Quintal's sentence for being a "minor participant" in the conspiracy. See § 3B1.2. As Quintal points out, a "minor participant" is defined as one who is "substantially less culpable than the average participant." Id., comment. (backg'd). The district court, however, "is not compelled to find that a defendant who is the least culpable in a particular transaction is therefore a minor participant." United States v. Molina, 934 F.2d 1440, 1452 (9th Cir.1991). Because the district court's finding is "heavily dependent on the facts of the particular case," id., it will only be reversed for clear error. United States v. Gillock, 886 F.2d 220, 222 (9th Cir.1989).
 
 
 63
 Quintal claims that he was only a courier for the drug transactions of others. But according to Krohn's testimony, Quintal was an active participant in a large drug transaction involving Kessack: Quintal found Kessack a reliable seller; arranged the sale; handled the money; and verified the quality of the drugs. There is no clear error in denying a reduction for being a minor participant to one convicted of a conspiracy to distribute drugs and who was an "actual participant in a drug transaction." Flores-Payon, 942 F.2d at 561. See Molina, 934 F.2d at 1452. The district court made no clear error in denying Quintal this reduction.
 
 
 64
 Finally, Quintal argues that the district court erred in denying him a reduction for acceptance of responsibility. On advice of counsel, Quintal refused to talk with the probation officer about the crimes for which he was convicted; after conviction, however, Quintal did write a letter to the court accepting responsibility for being involved with drugs, but not for any of the offenses involved in his case. Quintal was in a tight corner. He wished to preserve an effective appeal, but also to get a reduction for acceptance of responsibility. If Quintal's appeal were successful, any statement freely made to the probation officer or to the court might be used against him at a new trial. Chasing a crumb, he might lose the loaf. In the event, Quintal was required to perform a difficult trick: say just enough to get the reduction without saying too much in case there was a new trial. Judge Kozinski has argued that putting a defendant to this kind of test is unconstitutional, but he was in dissent. Aichele, 941 F.2d at 767-770.
 
 
 65
 There is no firm evidence that, in denying Quintal the reduction, the district court "consider[ed] against [Quintal] any constitutionally protected conduct." United States v. Watt, 910 F.2d 587, 592 (9th Cir.1990) (emphasis original). The district court might have believed that Quintal's generalized regret for involvement with drugs was insufficient proof of his contrition for his crimes, or that Quintal's regret was a purely legal tactic, not an honest emotion. But the district court gave no clear statement of why, in fact, it was denying Quintal the reduction. As in Sitton, we remand to the district court "for the limited purpose of clarifying the record on this issue ... [T]he district court [should] make additional findings as to its reasons for denying the requested acceptance of responsibility reduction," to ensure that none of Quintal's constitutionally protected conduct was made to hurt him. Sitton, 968 F.2d at 962.
 
 
 66
 E. Granger.
 
 
 67
 (1) Membership in the Conspiracy.
 
 
 68
 Granger challenges the sufficiency of the evidence supporting his conviction for conspiracy to distribute cocaine. Such a challenge faces the most onerous standard of review. Granger must show that after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); United States v. Sanchez-Mata, 925 F.2d 1166 (9th Cir.1991).
 
 
 69
 Granger does not question that Kessack sat at the center of an extensive conspiracy to distribute cocaine. But he does deny his membership in that conspiracy. Granger forthrightly admits that he regularly bought cocaine from Kessack and re-sold it to various and unnamed purchasers. That is, he admits to a conspiracy with Kessack--but with Kessack alone--to distribute cocaine. This small conspiracy, he argues, was independent of Kessack's larger drug ring. The jury was told that it must find Granger guilty of the large conspiracy or acquit him of the charge. The jury convicted.
 
 
 70
 Granger concedes that a single, large conspiracy was proved. There was an ocean of evidence establishing the conspiracy of the Kessack drug ring. "Once the government has established that a conspiracy exists, 'evidence of only a slight connection is necessary to convict a defendant of knowing participation in it.' " United States v. Arbelaez, 719 F.2d 1453, 1458 (9th Cir.1983) (quoting United States v. Kenny, 645 F.2d 1323, 1335 (9th Cir.), cert. den., 452 U.S. 920 (1981)). But that slight connection must still be proved. The government must establish that the defendant knew or had reason to know of the scope and object of the conspiracy and that the defendant knew his own benefits were dependent on the success of the entire venture. United States v. Brown, 912 F.2d 1040, 1043-44 (9th Cir.1990); United States v. Bailey, 607 F.2d 237, 243 (9th Cir.1979); Arbelaez, 719 F.2d at 1458-59.
 
 
 71
 All the evidence introduced by the government establishes only that Granger conspired with Kessack to distribute cocaine. The evidence against Granger consisted entirely of six taped phone conversations and the testimony of Stokes and Ed Krohn. The government's wiretaps recorded well over 3,000 phone calls. Of these, there were only six that involved Granger. All six were between Granger and Kessack. The conversations either arranged the sale of cocaine or a meeting-place to make the sale. In themselves, these conversations are highly incriminating. But they do nothing to prove Granger's knowledge of the larger conspiracy. In their conversations, Granger and Kessack never mention other members of the conspiracy. Similarly, in the thousands of recorded conversations, no other conspirator ever mentions Granger's name.
 
 
 72
 Krohn was a bagman and courier for Kessack. He testified that on a trip between Washington State and California, he and Kessack stopped off in Woodland, Washington, where Granger lived before his arrest. Woodland is about 125 miles south of Seattle, where the Kessack drug ring was based. Kessack said that he had to pick up some money from someone named "Gary". They drove to "this Gary's house", but nobody was home. This event, having nothing to do with Granger himself, is useless in establishing what Granger knew.
 
 
 73
 For the last two months before Kessack was arrested, he lived at Stokes' house. During that time, Stokes accompanied Kessack on three car trips to a motel somewhere in south King County, Washington. At each of these meetings, Kessack and Granger met in a hotel room, while Stokes sat in the car. Stokes thought the meetings were drug deals. But not having been present in the room, he could not say for sure. This is only more proof that Granger was involved in a conspiracy with Kessack to distribute cocaine. Stokes' testimony does not help to establish that Granger knew about the larger conspiracy, let alone that he knew of its scope or his dependence on it.
 
 
 74
 There is a single piece of evidence that might appear to connect Granger to the larger conspiracy. Sometime in the summer of 1989, Stokes delivered 12 to 16 ounces of cocaine to Granger. Granger had made arrangements with Kessack for the drugs, but Kessack could not himself make the delivery. Kessack was staying at Stokes' house at the time, and he asked Stokes to make the delivery. Stokes met Granger at a Block House restaurant on Highway 99. He handed the drugs to Granger. Granger did not pay Stokes anything in return, telling Stokes that he would pay Kessack directly. By his own words, Stokes was merely a "messenger" for Kessack in this transaction.
 
 
 75
 The fortuity that Stokes, a self-confessed member in the larger conspiracy, delivered cocaine to Granger for Kessack is not enough for a rational juror to conclude that Granger knew of the larger conspiracy. From the evidence the government put on at trial, nothing establishes that Granger knew or had reason to know of Kessack's other retailers, his suppliers or any purchasers. None of the many thousands of taped conversations indicates that Granger knew of the larger conspiracy. Like the defendant in Brown, "[n]othing at all shows that he knew of other transactions, or that he knew there was an overall plan at all." 912 F.2d at 1044.
 
 
 76
 It is certainly true that a rational juror can infer from circumstantial evidence that a defendant knew of a conspiracy. United States v. Baxter, 492 F.2d 150, 158-59 (9th Cir.1973). But in the delicate business of factual inference, one must not confuse
 
 
 77
 similar purposes of numerous separate adventures of like character with the single purpose of one overall scheme. While the individual defendants may have entered a conspiracy with some of the other indicted co-conspirators, the Government had the burden of connecting each defendant directly or circumstantially with the larger over-all scheme.
 
 
 78
 Id. (citations omitted). The government has not proved that Granger even knew of the existence of any conspirators in the Kessack drug ring, except Kessack and Stokes. And there is no evidence that Granger knew Stokes was a part of the larger conspiracy. The evidence simply does not permit the inference that Granger knew that the members of the Kessack drug ring were his confederates. The government has failed to prove, either directly or circumstantially, Granger's connection to the large conspiracy of the Kessack drug ring.
 
 
 79
 Nonetheless, the government did prove that Granger was involved in a smaller conspiracy to distribute cocaine with Kessack. That smaller conspiracy was contained within the words of the indictment. Where the indictment charges a single large conspiracy and the proof shows several smaller ones, each within the words of the indictment, the variance warrants reversal only if it prejudiced the defendant. United States v. Berger, 295 U.S. 78, 81 (1935). Granger was sullied by the introduction of massive evidence proving a conspiracy in which he played no part. "[T]here is a tendency in conspiracy cases for the jury to believe that a defendant must have been involved in the alleged over-all conspiracy once it finds that the defendant committed one of the minor acts which the prosecution contends is but an extension of the greater conspiracy." United States v. Bailey, 607 F.2d 237, 245 (9th Cir.1979). There is obvious prejudice if the jury convicted Granger because of someone else's acts.
 
 
 80
 There was insufficient evidence of Granger's membership in the larger conspiracy for a rational juror to convict him on Count One. "An appellate reversal of a conviction on the basis of insufficiency of the evidence has the same effect as a judgment of acquittal: the Double Jeopardy Clause precludes trial." United States v. Bibbero, 749 F.2d 581, 586 (9th Cir.1984). Granger may be re-tried for his participation in the smaller conspiracy with Kessack. But he may not be re-tried for any involvement with the larger conspiracy alleged in the indictment.
 
 
 81
 (2) Substantive Charges.
 
 
 82
 "[A] party to an unlawful conspiracy may be held responsible for substantive offenses committed by his co-conspirators in furtherance of the unlawful project, even if the party himself did not participate directly in the commission of the substantive offense." United States v. Crespo de Ilano, 838 F.2d 1006, 1019 (9th Cir.1987). See United States v. Pinkerton, 328 U.S. 640 (1946). Granger was not a member of the larger conspiracy. The members of the Kessack drug ring were not his coconspirators. He therefore cannot be held accountable for their actions on the basis of coconspirator liability.
 
 
 83
 Granger was convicted of seven counts of possession of cocaine with intent to distribute. In none of those counts was Granger either a named principal or in any way involved. He clearly was convicted of those crimes solely on the basis of coconspirator liability. Those convictions cannot stand. Granger's convictions on Counts 19, 22, 41, 69, 80, 81, and 82 are reversed. For the same reason, Granger's conviction on Count 21, distribution of cocaine, must also be reversed.
 
 
 84
 Granger was also convicted of three counts of telephone calls made to facilitate a conspiracy. These convictions stand. First, an acquittal on the underlying conspiracy count does not render the convictions on the telephone counts invalid. United States v. Brown, 761 F.2d 1272, 1277 (9th Cir.1985). See United States v. Powell, 469 U.S. 57 (1984). Second, the jury might well have found that the calls were made to facilitate the smaller conspiracy, which was contained within the words of the indictment. Either way, the taped conversations convincingly prove the charges. Finally, Granger's conviction on Count 70, which involved a distribution of cocaine from Kessack to Granger, is affirmed. In sum, Granger's convictions on Counts 1, 19, 21, 22, 41, 69, 80, 81, and 82 are reversed. His convictions on Counts 23, 24, 65, 70 and 83 are affirmed.
 
 
 85
 Granger does not appeal his conviction on Count 83 and we leave it undisturbed. However, Granger was the only named principal in Count 83. The other defendants were convicted on this count based on a theory of co-conspirator liability. But if Granger was not their co-conspirator, they cannot be held accountable for his actions based on co-conspirator liability. Petty, DeWitt, Debraine, and Quintal's convictions on Count 83 are reversed. Kessack's conviction on Count 83 stands. He was Granger's co-conspirator and must suffer the consequences.
 
 
 86
 F. Kessack.
 
 
 87
 Kessack argues that the restrictions placed on his review of discovery materials violated the Sixth Amendment and require a new trial. This claim is frivolous, both factually and legally. First, Kessack does not even allege that his lack of access affected any part of his trial. Second, Kessack in fact had access to the discovery materials during the mornings and evenings of trial and during the trial itself. Third, the jail was crowded and security required that Kessack review the documents alone. He could have had freer access to the materials in a "lockdown cell", but his tender and delicate sense of dignity kept him from that place. In this context, Kessack had reasonable access to the materials and the Constitution requires no more. United States v. Robinson, 913 F.2d 712, 717 (9th Cir.1990).
 
 
 88
 Kessack raises two sentencing issues. The Sentencing Guidelines require that a defendant's base offense level be increased by two if "a firearm or other dangerous weapon was possessed during commission of the [drug] offense." § 2D1.1(b)(1). The enhancement should not be applied if it is "clearly improbable that the weapon was connected to the offense." § 2D1.1, comment (n. 3). The application of the Guidelines is reviewed de novo. United States v. Lawrence, 916 F.2d 553, 554 (9th Cir.1991). Factual findings are reviewed for clear error. United States v. Burns, 894 F.2d 334, 336 (9th Cir.1990).
 
 
 89
 The statutory language of "possessed during the commission of the offense" refers to the entire course of criminal conduct, not only to the offense of conviction. United States v. Willard, 919 F.2d 606, 610 (9th Cir.1990). "[T]he key is whether the gun was possessed during the course of criminal conduct, not whether it was 'present' at the site" of a particular crime. United States v. Stewart, 926 F.2d 899, 901-02 (9th Cir.1991). When one is convicted of conspiracy, which has no situs, the possession of the gun during the course of the conspiracy is enough to require enhancement; the gun need not be proved to have been possessed during any particular overt act. Id. Kessack does not contest that he gave Krohn a gun in furtherance of the conspiracy. It follows that, at least within the meaning of the Guidelines, Kessack did possess a gun during the commission of a drug offense. Kessack gave the gun to Krohn explicitly to protect him while he ferried the conspiracy's drugs and money between Washington and California. From the evidence at trial it was not "clearly improbable" that the gun was linked to the conspiracy.
 
 
 90
 Finally, we reject Kessack's argument that he should have been given a two level reduction for acceptance of responsibility. Kessack's claim is incredible and the district court made no clear error in denying it.
 
 
 91
 G. Petty.
 
 
 92
 Petty raises a number of challenges to his sentence. First, he contends that the district court erred in refusing to reduce his sentence for acceptance of responsibility. Like Debraine, Petty sought a plea agreement; was rebuffed when the government refused to accept anything but a package of pleas; and was thus forced to trial. However, unlike Debraine, Petty did not himself offer a post-trial statement accepting responsibility for his crimes. Instead, Petty's lawyer sent a letter to the probation officer preparing Petty's presentence report, asserting that Petty had "expressed extreme remorse for his conduct" but noting that, because he had legal issues to appeal, Petty "cannot personally provide [the probation officer] with a more detailed statement." Like Quintal, Petty was obviously employing his right against self-incrimination.
 
 
 93
 As in Debraine's and Quintal's cases, the district court did not clearly explain its reasons for denying the reduction in Petty's case. The district court did note generally that "none of the defendants [has] made a voluntary and truthful admission" of his involvement in the conspiracy. This loose statement, undoubtedly based upon the Commentary to section 3E1.1, might nonetheless be read as a critical reference to Petty's (and Quintal's) reliance on his right against self-incrimination, which would be improper. Sitton, 968 F.2d at 962. Because the district court's reasons for denying Petty the reduction are unclear, we are "unable to determine whether the denial was consistent with [Petty's] constitutional rights," id., and remand for the purpose of clarifying the record. The district court might well find that Petty's statement through his lawyer was either insufficient or insincere. See United States v. Ramos, 923 F.2d 1346, 1359 (9th Cir.1991) (a defendant's "minimalist description of his involvement in the affair" is insufficient for 3E1.1 reduction "given evidence which suggested a much deeper involvement in the scheme"). But the court must say so, without any troubling allusions to Petty's invocation of his constitutional rights.
 
 
 94
 Petty also makes a three-part challenge to his Criminal History score. The district court, following the presentence report, found that Petty had four Criminal History points, which put Petty in Criminal History Category III. One of those points was for a 1979 conviction for an assault on his brother in an aircraft. Petty and his brother apparently were drunk and got in a fight on an airplane. Another point was added for a 1988 conviction for driving while intoxicated, for which Petty received three years summary probation. Two more points were added because Petty committed the offense of his conviction while on probation for the DWI conviction. See § 4A1.1(d). Committing an offense while on summary probation for a DWI conviction does require the addition of two points under section 4A1.1(d). United States v. Sanchez, 914 F.2d 1355, 1363 (9th Cir.1990), cert. denied, 111 S.Ct. 1626 (1991).
 
 
 95
 Petty first contends that because he already had committed an act in furtherance of the conspiracy before the 1988 DWI conviction, his crime of conspiracy was complete before he was ever placed on probation. But the Commentary makes clear that two points must be added "if the defendant committed any part of the instant offense (i.e., any relevant conduct) while under ... probation." Id., comment. (n. 4). The evidence firmly establishes that Petty did commit other acts in furtherance of the conspiracy while he was on probation. The application of section 4A1.1(d) to Petty's case was required by the Guidelines.
 
 
 96
 Petty next challenges the district court's refusal to depart downward under the authority of section 4A1.3, which gives a court the discretion to depart downward where "a defendant's criminal history category significantly overrepresents the seriousness of a defendant's criminal history." But an appellate court has no jurisdiction to review a district court's discretionary refusal to depart downward from the applicable guidelines. United States v. Morales, 898 F.2d 99 (9th Cir.1990). It is worth noting, however, that Petty's sentence was within the allowable guideline range for both Criminal History Categories II and III.
 
 
 97
 Finally, Petty argues that his Criminal History score, inflated by his assault and DWI convictions, resulted in a sentence so disproportionate to his crime that it constitutes cruel and unusual punishment. Petty was sentenced to 360 months. The "narrow proportionality principle," Harmelin v. Michigan, 111 S.Ct. 2680, 2702 (1991), of today's Eighth Amendment jurisprudence "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Id. at 2705 (quoting Solem v. Helm, 463 U.S. 277 (1983)). In Harmelin, a majority of the Court held that the Eighth Amendment was not violated by a mandatory term of life in prison without the possibility of parole for a first offense of possessing 672 grams of cocaine. Petty received a less severe penalty for a more severe crime. A fortiori, the Eighth Amendment was not violated.
 
 
 98
 The judgments are AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3